FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAY 2 1 2015

JAMES N. HATTEN, Clerk
By:
Deputy Clerk

AT

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

REMA TIP TOP/NORTH AMERICA, INC.,)
                           )

      Plaintiff,          )

                           )  **1:15-CV-1838**

v.                     ) Case No. _____

                           )

SHAW-ALMEX FUSION, LLC and     )
MICHAEL CREMEENS, individually,   )

                           )

      Defendants.      )

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER

### I.    Introduction.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and other applicable law, and for the reasons set forth herein, Plaintiff REMA Tip Top/North America, Inc. ("Plaintiff" or "REMA") respectfully requests that the Court enter a temporary restraining order and interlocutory injunction against Defendants Shaw-Almex Fusion, LLC ("Shaw-Almex") and Michael Cremeens ("Cremeens") (collectively "Defendants"). In support of this Motion for Temporary Restraining Order and Preliminary Injunction, REMA shows that Defendants have misappropriated trade secrets of REMA and that Defendants' use of those trade secrets will cause irreparable harm to REMA if not enjoined by this Court.

Pending expedited discovery and the filing and briefing of a motion for preliminary injunction, REMA seeks relief in the form of the attached proposed order providing the following limited relief:

1.      Immediately enjoin Defendants from using or disclosing in any way any information, or derivatives therefrom, contained in documents or computer files originating from any REMA computer system, including, without limitation, the Excel spreadsheet titled "2003-02 RTT Recepies.XLS", or any other document originating from REMA. As used in this paragraph REMA shall be defined as REMA or any entity affiliated with REMA, including any parent or subsidiary corporations, and shall not be limited to REMA entities in the United States but includes its global family of companies.

2.      Immediately enjoin Defendants from (i) altering, erasing, deleting, OR destroying any computer, computer drive, computer disk, backup tape or data, or other information-containing medium currently in their possession, custody or control, including without limitation any metadata contained or saved on any such medium; or (ii) in any way spoliating any evidence pertaining to the allegations in REMA's Complaint;

3.      Order Defendants to permit, within three (3) business days of receipt of the Court's Order, a computer examiner, not directly employed with REMA, to

2

access and make two (2) digital images of (i) any and all of Defendant Cremeens'
personal computer devices, which shall include without limitation any computer,
computer drive, computer disk, backup tape, flash drive, external drives, cloud
based storage, and iPhone or other mobile telephone devices; (ii) Defendant
Cremeens' Apple and any other computer (including laptops) used for his work
with Defendant Shaw Almex as of April 10, 2015; and (ii) Defendant Shaw-
Almex's computer servers hosting its user directories, e-mail system, and any
research and development data storage system that hosted data used in connection
with developing products competitive to REMA's Remaline products, filler rubber,
or bonding layers. For each of the foregoing servers, Defendant also shall make
available for digital imaging as set forth above, each and every backup tape , and
other backup data medium(s),or backup data set maintained by Defendant for all
periods of time from January 1, 2012 through the present. One of the digital
images made pursuant to this Order shall be filed with the Court as evidence; the
other image shall be delivered to counsel for REMA for examination, provided that
counsel for REMA shall not reveal the contents of the images to any employee of
REMA unless it is pursuant to an order of this Court or pursuant to express written
permission by Defendant Shaw Almex. If Defendants desire a set of digital images

3

identical to those prepared as ordered, one shall be provided by the computer examiner provided Defendant first pays for its copy of the images.

4.      Providing for the parties to engage in expedited written discovery and depositions.

## II.      **Factual Background.**

### A.      The Parties.

Plaintiff REMA is a wholly-owned subsidiary of REM AG, a German corporation which, in turn, is wholly-owned by STAHLGRUBER Otto Gruber AG ("STAHLGRUBER"), a German corporation, and maintains a production and shipping facility in Madison, Morgan County, Georgia. (Declaration of Olafur Gunnarsson (hereinafter "Gunnarsson Decl.") at ¶¶ 4,6.) REMA is engaged in the business of selling and distributing products manufactured by STAHLGRUBER or manufactured for STAHLGRUBER by one of its wholly owned subsidiaries, as well as products manufactured by REMA itself. (Gunnarsson Decl. at ¶ 5.) STAHLGRUBER operates a global enterprise of companies, including REMA, and is a global market leader in the manufacture of high-quality conveyor maintenance products, wear protection products, corrosion protection products, bonding systems, and automotive tire repair and retread products. (Gunnarsson Decl. at ¶ 7.)

4

REMA and STAHLGRUBER have built reputations for the manufacture of products of the highest quality and that have proprietary properties, including integrated elastomer and adhesive systems, reactive bonding layers, increased durability resulting from composition and manufacturing processes, and production capacity. (Gunnarsson Decl. at ¶ 7.) REMA and STAHLGRUBER products are manufactured strictly in accordance with chemical formulae that are owned and maintained by STAHLGRUBER. The chemical formulae are trade secrets and kept strictly confidential. (Gunnarsson Decl. at ¶ 9.)

REMA's Industrial Division is a leader in providing products and services for conveyor maintenance, wear protection, and surface protection and its products are designed, among other things, to considerably extend the life of industrial equipment. (Gunnarsson Decl. at ¶ 10.) Among other things, REMA sells and distributes a line of products known as Remaline, which are proprietary compounded elastomers manufactured by STAHLGRUBER that serve to provide superior wear protection, vibration reduction, and noise reduction. REMA also sells and distributes filler rubber and pulley lagging with a proprietary bonding material. (Gunnarsson Decl. at ¶ 11.)

Defendant Michael Cremeens ("Cremeens") formerly was an employee of REMA and currently is employed by Defendant Shaw-Almex Industries, Ltd.

5

("Shaw-Almex") as Vice President Business Development and maintains an office at 5051 Snapfinger Woods Drive, Decatur, Georgia 30035. (Gunnarsson Decl. at ¶ 4.) Cremeens has worked in the conveyor and wear protection business for many years. Cremeens previously was an employee of REMA and worked as its Technical Manager. After leaving REMA, Cremeens was employed by another conveyor engineering company and then returned to Shaw-Almex.

Olafur Gunnarsson is President of REMA and works in REMA's office located in Northvale, New Jersey. In March or April of 2015, Gunnarsson received a call from a REMA customer informing Gunnarsson that he was visited by Matt Moher and Brent Fenty, sales representatives of Shaw-Almex, who represented that Shaw-Almex had products that were copies of REMA products. (Gunnarsson Decl. at ¶ 13.) The customer explained to Gunnarsson that he was calling because it appeared that Shaw-Almex was "coming after" REMA. (Gunnarsson Decl. at ¶ 14.) Following his conversation with this customer, Gunnarsson and another representative of REMA, Joe Jernigan, Vice President of Industrial Sales, met with Cremeens on or about May 1, 2015 in a hotel near Hartsfield-Jackson Atlanta International Airport. (Gunnarsson Decl. at ¶ 15.)

6

B.   REMA's Formulae on Defendants' Computer System.

During the course of the meeting, Gunnarsson inquired about Shaw-Almex's copying REMA products. Cremeens told Gunnarsson that Shaw-Almex can make products identical to those of REMA. (Gunnarsson Decl. at ¶ 16.) In claiming Shaw-Almex had the ability to make products identical to those of REMA, Cremeens specifically mentioned filler rubber, 78" lagging with the same bonding material as REMA's lagging, and the entire line of Remaline products. (Gunnarsson Decl. at ¶ 16.) When challenged about the ability of Shaw-Almex to make similar products, Cremeens told Gunnarsson that Shaw-Almex has REMA's formulations. (Gunnarsson Decl. at ¶ 17.) To prove his point, Cremeens displayed to Gunnarsson and Jernigan on an Apple laptop a file that was saved on that computer titled "2003-02 RTT Recepies.XLS" (the "Recipe File"), which Gunnarsson recognized as being in German and saw other indicia identifying the document as possibly belonging to REMA and its parent company. (Gunnarsson Decl. at ¶ 17.) When questioned about the source of the Recipe File, Cremeens replied to the effect that he could not disclose that information. (Gunnarsson Decl. at ¶ 18.) At that time, Gunnarsson used the camera on his phone to capture an image of the Recipe File as displayed on Cremeens' computer. (Gunnarsson Decl. at ¶ 19.)

After investigating, REMA and STAHLGRUBER determined that the Recipe File displayed to Gunnarsson was an authentic electronic copy of the trade secret formulas for the Remaline product line. (Gunnarsson Decl. at ¶ 20.) The Recipe File is an Excel spreadsheet with tabs for each of approximately 16 compounds for rubber-based wear protection products that were specifically developed by STAHLGRUBER for sale and distribution exclusively by its wholly owned subsidiaries, including plaintiff REMA. (Gunnarsson Decl. at ¶ 20.) The Recipe File shows at the tab that is open and displayed the components used to make the product identified, the amounts of each component, the cost per unit of each component, the total cost per unit of volume for the product, and the historical formulaic information for prior versions of the product along with all of the foregoing details for each prior version. (Gunnarsson Decl. at ¶ 22.) The tab that was open and displayed by Cremeens to Gunnarsson and Jernigan included the trade name of one of REMA's rubber based wear protection products. (Gunnarsson Decl. at ¶ 22.) In investigating the authenticity of the file displayed by Cremeens, REMA and STAHLGRUBER confirmed that the format and content of the file appeared substantively identical to the master file maintained by STAHLGRUBER. (Gunnarsson Decl. at ¶ 23.)

8

During the meeting or in a subsequent conversation, Cremeens informed Gunnarsson that Shaw-Almex has had the Recipe File for approximately three years and recruited Cremeens' brother, Scott Cremeens, a doctoral rubber chemist with 40 years of industry experience, out of retirement to perfect the manufacture of the products using the proprietary, trade secret REMA formulas because Shaw-Almex was unsuccessful in their first manufacturing attempts. (Gunnarsson Decl. at ¶ 24.) Cremeens also told Gunnarsson and Jernigan that Shaw-Almex has the ability to make a "perfect sample" of the REMA and STAHLGRUBER products. (Gunnarsson Decl. at ¶ 25.) Cremeens further informed Gunnarsson that Shaw-Almex was in the process of being sold. Upon information and belief, Shaw-Almex is scheduled to be sold to Semperit AG Holding, or a related affiliate. (Gunnarsson Decl. at ¶ 26.) Semperit AG Holding is a global enterprise based in Belgium, and includes an Industrial Division that manufactures and services rubber products and conveyor belt systems to, among others, the mining industry. (Gunnarsson Decl. at ¶ 26.) In a subsequent conversation, Cremeens told Gunnarsson that Shaw-Almex has delivered to a customer 10 rolls of a 40 roll order of product develop from the Recipe File, and that another 20 rolls were scheduled for production. Upon information and belief, Shaw-Almex has the

9

present ability to produce competing products using the proprietary trade secret formulas belonging to REMA and STAHLGRUBER. (Gunnarsson Decl. at ¶ 27.)

### C.     The Importance of the Formulae and REMA's Efforts to Keep Those Documents Secret.

The information and computer files of REMA misappropriated by Cremeens and Shaw-Almex contain or constitute information that derives economic value from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure and use. (Gunnarsson Decl. at ¶ 28.) The information contained in the Recipe File is confidential to REMA and is subject to strict efforts to maintain its secrecy. Even within REMA, very few individuals have access to the formulas. (Gunnarsson Decl. at ¶ 29.) For example, REMA formulas are kept in electronic and paper formats, maintained in a sealed envelope in a safe and only two individuals, not including the company president (Gunnarsson), have the combination. (Gunnarsson Decl. at ¶ 29.) Furthermore, the retention of the formula in sealed envelopes create a control and record for identifying anyone who has accessed or attempted to access the information. (Gunnarsson Decl. at ¶ 29.) The Recipe File information is not available from any source other than REMA or STAHLGRUBER and is not known or available to the public in general or, specifically, to competitors of either REMA or STAHLGRUBER. (Gunnarsson

10

Decl. at ¶ 30.) The information and computer files of REMA misappropriated by Shaw-Almex and shared with Cremeens and others are and at all relevant times have been the subject of reasonable efforts by REMA and all related or affiliate companies to maintain its secrecy. (Gunnarsson Decl. at ¶ 31.)

### D. Irreparable Harm to REMA.

The information contained in the Recipe File would be very valuable to a competitor of REMA who could derive value from knowing the components that make up the formula for the Remaline or other REMA products, the amounts of each component in the current version of the formula, the cost per unit of each component, the total cost per unit of volume for the REMA product, and the historical formulaic information for prior versions of the product, along with all of the foregoing details for each prior version. (Gunnarsson Decl. at ¶ 32.) The current information in the Recipe File coupled with the historic information would show a competitor not only how the current formula is made, but all of the historical advances made by REMA in improving the quality of its products and lowering the cost of producing those products. (Gunnarsson Decl. at ¶ 33.)

A competitor of REMA could obtain a distinct and unfair advantage in the marketplace if the information described herein were made available to it, essentially allowing the competitor unfairly to bypass many years of research and

11

development and the associate costs of such efforts to be able to produce the highest quality product on the market. (Gunnarsson Decl. at ¶ 34.) The impact of a competitor learning this confidential information, using this information to market and sell products, and sharing this information with mutual customers would result in permanent, long-term, and irreparable economic damage to REMA's business. (Gunnarsson Decl. at ¶ 34.) With the Recipe File, Cremeens or Shaw-Almex could use the information to disrupt and permanently damage REMA's actual and prospective customer relationships. It would be impossible to value the full extent of the damage that is threatened by Cremeens or Shaw-Almex's use of the information contained in the documents and files misappropriated as set forth above. (Gunnarsson Decl. at ¶ 35.)

### III.  Argument and Citation of Authority.

#### A.  Standard for Issuance of Injunctive Relief.

Temporary injunctive relief to preserve the status quo is appropriate when the ordinary standards for the issuance of temporary injunctive relief are satisfied. *United States v. State of Alabama*, 791 F. 2d 1450, 1459 (11th Cir. 1986)("The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits"). A temporary restraining order ("TRO") may be entered in advance of a full hearing

whenever a plaintiff will suffer immediate and irreparable injury, loss or damage before it is possible for the defendant to be heard in opposition to the Plaintiff's motion for preliminary injunction. Fed. R. Civ. P. 65; *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3rd Cir. 1995). As shown below, the facts of this case establish that REMA will suffer immediate and irreparable harm in the absence of an order requiring Defendants to preserve, disgorge, and not to use or disclose REMA's trade secret information for competitive or other purposes.

The review of a district court's decision to grant or deny a temporary restraining order is very narrow in scope, highly deferential, and will only be reversed upon a finding of clear abuse of discretion. *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1209 (11th Cir. 2003); *Siegel v. Lepore*, 234 F.3d 1163, 1175 (11th Cir. 2000). To support a TRO or preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in a plaintiff's favor. *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1985). A district court may issue a TRO or preliminary injunction when the moving party shows that:

1.      There is a substantial threat that the movant will suffer an irreparable injury if injunctive relief is not granted;

13

2.     The threatened injury to the movant outweighs the threatened harm the injunction may inflict on the respondent;

3.     There is a strong probability of success on the merits of the case; and

4.     The granting of the injunction will not disserve the public interest.

*Four Seasons Hotels*, 320 F.3d at 1210; *Siegel*, 234 F.3d at 1176; *Tefel v. Reno*, 180 F.3d 1286, 1295 (11th Cir. 1999).  A showing of irreparable injury is the *"sine qua non"* of a request for injunctive relief. *Siegel*, 234 F.3d at 1176.

REMA's motion for temporary injunctive relief should be granted because Defendants have violated the Georgia Trade Secrets Act.  *See* O.C.G.A. § 10-1-762(a); *Essex Group v. Southwire Co.*, 269 Ga. 553 (1998).

> B.     There is a substantial likelihood that REMA will prevail on the merits of its Trade Secrets Claim.

While proof of a substantial likelihood of success on the merits is the first prerequisite to preliminary injunctive relief, it is not necessary for a plaintiff to demonstrate a no-lose situation in order to obtain such relief. "[A] court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements *of probable* outcomes." *B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp.*, 785 F. Supp. 222, 227 (D. Mass. 1991) (*quoting Narrangansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st

14

Cir. 1991)); *Roadway Express, Inc. v. Donovan*, 603 F. Supp. 249, 251 (N.D. Ga. 1985).

REMA easily satisfies this element of the test for injunctive relief because, as demonstrated below, Georgia law provides statutory protection of trade secret information. There can be no dispute that the information at issue falls under the definition of trade secrets under Georgia law. Moreover, Plaintiff has unquestionably demonstrated actual misappropriation of its trade secrets by Defendants. *See American Software USA, Inc. v. Moore*, 264 Ga. 480, 484 (1994).

REMA's formulas that appear on Defendants' computer system are protected as trade secrets under Georgia law. The Georgia Trade Secrets Act ("GTSA") defines the term "trade secret" as any information that (1) has actual or potential economic value to its possessor because others who can obtain economic value by using or disclosing it generally do not know it and cannot readily ascertain it by proper means; and (2) is the subject of reasonable efforts under the circumstances to maintain its secrecy. O.C.G.A. § 10-1-761(4). The GTSA specifically provides for injunctive relief to protect not only actual, but also "threatened misappropriation" of a trade secret. O.C.G.A. § 10-1-762(a).

The proprietary information at issue in this case satisfies both prongs of the trade secret definition. Georgia courts have repeatedly held that computer files containing the substance of, and specific information about, particular product formulas constitutes protectable trade secrets under the GTSA because the information has actual economic value and is not readily known to competitors. *See DeGiorgio v. Megabyte Int'l, Inc.*, 266 Ga. 539, 540 (1996); *Avnet v. Wyle Labs. Inc.*, 263 Ga. 615, 616-17 (1993); *see also* O.C.G.A. § 10-1-791(4); *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1410 (11th Cir. 1998). As set forth in the Declaration of Olafur Gunnarsson, none of the information contained in REMA's formulas are known to competitors and all of this information could be used by competitors, including Defendants, to compete unfairly by using REMA's formula developed over a number of years and understanding REMA's cost information.

Second, REMA has made reasonable efforts to keep this proprietary information secret. The information contained in the Recipe File is confidential to REMA and is subject to strict efforts to maintain its secrecy. Even within REMA, very few individuals have access to the formulas. For example, REMA formulas are kept in electronic and paper formats, maintained in a sealed envelope in a safe and only two individuals, not including the company president (Gunnarsson),

have the combination. Furthermore, the retention of the formula in sealed envelopes creates a control and record for identifying anyone who has accessed or attempted to access the information. The Recipe File information is not available from any source other than REMA or STAHLGRUBER and is not known or available to the public in general or, specifically, to competitors of REMA or STAHLGRUBER.

The information and computer files of REMA misappropriated by Shaw-Almex and shared with Cremeens and others are and at all relevant times have been the subject of reasonable efforts by REMA and all related or affiliate companies to maintain its secrecy. *See CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F.Supp. 339, 357 (M.D. Ga. 1992) (finding that plaintiff had "made considerable efforts to maintain the secrecy" of its computer software.)   The information contained in the Recipe File would be very valuable to a competitor of REMA who could derive value from knowing the components that make up the formula for the Remaline or other REMA products, the amounts of each component in the current version of the formula, the cost per unit of each component, the total cost per unit of volume for the REMA product, and the historical formulaic information for prior versions of the product along with all of the foregoing details for each prior version. The current information in the Recipe File coupled

17

with the historic information would show a competitor not only how the current formula is made, but all of the historical advances made by REMA in improving the quality of its products and lowering the cost of producing those products.

A competitor of REMA could obtain a distinct and unfair advantage in the marketplace if the information described herein were made available to it, essentially allowing the competitor unfairly to bypass many years of research and development to be able to produce the highest quality product on the market. The impact of a competitor learning this confidential information, using this information to market and sell products, and sharing this information with mutual customers would result in permanent, long-term, and irreparable economic damage to REMA's business. With the Recipe File, Cremeens or Shaw-Almex could use the information to disrupt and permanently damage REMA's actual and prospective customer relationships. It would be impossible to value the full extent of the damage that is threatened by Cremeens or Shaw-Almex's use of the information contained in the documents and files misappropriated as set forth above.

In order to establish a claim for misappropriation of trade secrets in violation of the GTSA, REMA must also establish the misappropriation of the trade secrets. *Camp Creek Hospitality Inns, Inc.*, 139 F.3d at 1410; *TDS Healthcare Sys.*

18

*Corp. v. Humana Hosp. Illinois, Inc.*, 880 F. Supp. 1572, 1582 (N.D. Ga. 1995). Here, the misappropriation of REMA's trade secrets is beyond dispute because REMA's sensitive documents have been found on Defendants' computer system.

Based on the foregoing, REMA has demonstrated a substantial likelihood that it will prevail on its claim for misappropriation of trade secrets in violation of the GTSA.

## C. REMA Will Suffer Irreparable Injury If Injunctive Relief Is Not Granted.

It is widely recognized that loss of confidential and proprietary information is not measurable in money damages and is thus considered "irreparable harm." O.C.G.A. § 10-1-762(a) (expressly allowing for injunctive relief for actual or threatened misappropriation of trade secret information); *Specialty Chemicals & Serv., Inc. v. Chandler*, No. 1:87-CV-2338MHS, 1988 WL 618583, at *5 (N.D. Ga. Sept. 29, 1988) (finding that the mere "[t]hreat of disclosure, destruction or dilution of [a] plaintiffs trade secrets constitutes irreparable injury justifying injunctive relief."); *Unisource Worldwide, Inc. v. S. Cent. Alabama Supply, LLC*, 199 F. Supp. 2d 1194, 1212 (M.D. Ala. 2001) (finding that harm to employer from former employee's alleged disclosure of trade secrets was irreparable); *see also Leo Publications, Inc. v. Reid*, 265 Ga. 561, 562 (1995)

(affirming trial court's order directing defendant to return former employer's customer list). The threat of irreparable injury, which REMA faces as a consequence of Defendants' misappropriation of its trade secrets, is clear. In light of the showing that Defendants possess REMA's trade secrets, the threat of disclosure, and more particularly use, of this information is significant. If REMA's confidential and trade secret information is actually used by Defendants in developing identical products and targeting customers, the injury suffered would be permanent.

### D.   The Balance of Hardships Supports Entry of Injunctive Relief.

Defendants will suffer no injury if the injunctive relief REMA seeks is issued. The only impact that the injunctive relief sought by REMA would have on Defendants is to force them to give up use of and access to REMA's confidential and trade secret information and to allow REMA to confirm (by examining Defendants' computer devices and back-up data and devices) that Defendants have not retained any copies or other derivatives of this information. In contrast, REMA has expended significant resources in the design and development of its trade secrets and has gone to great lengths to ensure that they remain secret and will incur immeasurable harm if its trade secrets are disclosed

20

to anyone. The hardship that REMA will suffer without injunctive relief in light of these efforts is clear.

E.     Temporary Injunctive Relief Will Not Disserve the Public Interest.

The public interest is best served by requiring persons to compete fairly rather than by using unlawful means to divert a competitor's employees and business. *See Specialty Chems. & Servs., Inc.*, 1988 WL 618583, at *6 ("Certainly, there is a cognizable public interest in discouraging employees from succumbing to the temptation of easy profit by breaching their employer's trust and misappropriating proprietary information for their own gain."); *Amedisys Holding, LLC v. Interim Healthcare of* Atlanta, 793 F.Supp. 2d (N.D.Ga. 2011) 1302, 1314. (If [Defendant] continues to unfairly compete, Plaintiff stands to lose significant revenue and the value of its trade secrets will erode materially. [Defendant ], on the other hand, cannot suffer compensable harm when enjoined from an unlawful activity). Accordingly, public interest would be served by ordering Defendants to return REMA's information to REMA and to enjoin Defendants from using such information for their own benefit.

## IV.   Conclusion

For all the of the aforementioned reasons, Plaintiff respectfully requests that

this Court grant its Motion for Temporary Restraining Order.

Respectfully submitted, this 21st day of May, 2015.

> OGLETREE, DEAKINS, NASH, SMOAK AND
> STEWART, P.C.
>
> By: _____
>
> David P. Thatcher
> Georgia Bar No. 703299
> Christopher M. Caiaccio
> Georgia Bar No. 102002
>
> One Ninety One Peachtree Tower
> 191 Peachtree Road, N.E., Suite 4800
> Atlanta, Georgia  30303
> Telephone:  (404) 881-1300
> Facsimile: (404) 870-1732
> david.thatcher@ogletreedeakins.com
> chris.caiaccio@ogletreedeakins.com
>
> Robert A. Sar
> (*pro hac vice* application to be filed)
> N.C. Bar No. 22306
> 4208 Six Forks Road, Suite 1100
> Raleigh, North Carolina  27609
> Telephone:  (919) 787-9700
> Facsimile: (919) 783-9412
> robert.sar@ogletreedeakins.com
>
> ***Attorneys for Plaintiff REMA Tip Top/North
> America, Inc.***